Good morning, Justices. Brian McManus for the Petitioner in this case. Opposing Counsel. Deidre Thornton worked for United Airlines from March 27th of 1987 to April 8th of 2000 when she had an accident. 13 years. Unfortunately, this woman was 5'3", 260 pounds. But during the 13 years that she worked for United, she had no accidents. Before this accident, no disability whatsoever. worked as a union worker, member of the Teamsters Union. Worked several different jobs, not just cabin service. Worked in the food lines, prepared food, put them in trays, stood up all day. The last seven years she worked as a cabin service worker, a position where she had to crawl in and out of planes. The point is, on the day of our accident, April 8th, 2000, she falls and suffers a trimalleolar fracture of her ankle. Undisputed. Has three surgeries. The first by Dr. Kinesis, the second by Dr. Kinesis where he removed hardware, and the third by Dr. Dennis Mess. I want and I challenge the court to find one piece of evidence in the record, one piece, that says this woman can return to work full duty. You won't find any. What was the last statement? Repeat what you just said. I challenge the court to find one piece of medical evidence in this record that says that the petitioner can return to work full duty without restrictions. But you're not challenging that each of her doctors found she could work in at least some type of a sedentary capacity, correct? I'm not challenging that. That's correct, Your Honor. The point, though, if we look at the record, we'll find that both treating doctors indicate that she's only capable of doing sedentary type work and that she'll need a total ankle replacement in the future. The respondent called two respondent section 12 examining doctors. One, Dr. Levin, in 2001, early on, says she's never going back to a job except a sedentary job. In 2006, when the case was getting ready for trial, they sent her to Dr. George Holmes, a well-known foot and ankle doctor. Dr. Holmes says she can only work sedentary work. She's never going back to full-time work. Now, keep in mind, before this accident, she did all sorts of work, had no limitations whatsoever. The first test for a 8D1 wage loss is, is she partially incapacitated for work? You will not find one piece of evidence that says this woman is not partially incapacitated from going back to her former job. She has restrictions. Now, keeping that in mind, there are only two witnesses that actually testified in this case, Deidre Thornton and her husband, Keith Thornton. United didn't call anyone to challenge Ms. Thornton's testimony. All the other evidence is brought in by medical records and vocational rehabilitation records. This case turned on an arbitrator's review of a vocational rehabilitation report by Sharon Zajac, who said Ms. Thornton was not reliable, she didn't cooperate with vocational rehabilitation. I'm here to tell you that the respondent was not reliable. Because when the respondent said to Mrs. Thornton, we realize you have these restrictions, we'll take you back in an accommodated position, what did Ms. Thornton do? She went back to work, United, in March of 2004 and worked in an accommodated, light-duty position until December of 2004 when United said, sorry, we can't do anything further for you in this accommodated position. Take a break. Take a walk. Was the accommodated position at the same pay as she previously received? Yes, it was, Your Honor. It was at the same pay because she was a union worker. So she wasn't losing any money. Now, shortly after she's told by United we can't accommodate your position anymore, in December of 2004, United starts paying her temporary compensation again in the hopes that some way we'd reach a settlement. And they went all the way and paid her until June of 2005 when it appeared that this case wasn't going to settle and she had gotten Social Security disability in March of 2005 because of the fact that she, although not totally and completely incapacitated from any type of work, the standard is, was there any work available for a 5'3", 260-pound, high school-educated black woman with a severe ankle injury that required her to wear a brace and a cam walker and to get up and down and all sorts of restrictions? There wasn't. Social Security gave her disability. Now in June, the respondent hires another expert witness, Joseph Belmonte, and I ask you to read his initial assessment because Joseph Belmonte is a good vocational rehab specialist. And he says, it is very, the prognosis for finding this woman a job with her restrictions in today's economy, forget about the fact that unemployment was at its highest rate in history in the United States, but the prognosis for finding this 5'3", 260-pound, black, high school woman a job when she has a trimalleolar fracture, wears a cam, a walker, are very, very dark, unlikely. And, goes one step further, if we find her a job, it will be in the range of $7 to $10 an hour. If we find her a job. So he issues his report in June 2005. Does United act on that report? Do they start looking for jobs? No. They wait until a year later to begin their second effort at vocational rehabilitation. Pay her the whole time. June 2006, they hire Sharon Zajac, not Joseph Belmonte, one of their associates, to start working with Mrs. Thornton to get her a job. Okay? Sharon Zajac tells her. And that gets in Mrs. Thornton's testimony. In the record, when you go to see these new employers, don't tell them about your disability. Violation of vocational rehabilitation standards. But don't tell them about your disability, your new employers. That brief period of vocational rehabilitation with Sharon Zajac goes from June until September 11th. And during that time, Sharon Zajac says how uncooperative Mrs. Thornton is. Because she goes to a wedding with her family, she reschedules it for three or four days later to come in for an appointment. She wears sloppy clothing and she wears sneakers to an appointment for a job interview. The fact of the matter is that she's got a brace on her ankle and she can only wear sneakers. But these are suggestions made in a report to try to undermine this woman and to try to place this woman as a malinger, as someone who doesn't want to work. Counsel, just so we're clear for the record, are you proceeding on the claim or the allegation that your client falls into the ADLAT, is entitled benefits under the ADLAT theory? Well, Justice, my personal feeling is it's one of those two theories. In other words, she's either an ADLAT permanent total, as Social Security in essence found, or there's no question she's an 8D1 wage loss differential. United's whole argument, by the way, that she's not a wage loss differential, is a circuitous argument that, oh, by the way, United doesn't have any cabin workers anymore. We outsource that work. So now the company that comes in and does our cabin service work, those people only get paid $9 or $10 an hour. Well, rather than jump theories, can you tell us specifically why she qualifies for benefits as an ADLAT? What evidence establishes that? Because at the time that this case went to trial, she was disabled, not from every type of job, but she was disabled from any job that was reasonably available in the marketplace for continuous employment. That's the standard, okay? And the bottom line is, if you look at the cases, you'll find out that my client is a lot more disabled than the ADLAT permanent totals that are cited in the record. Whose burden is it to show that? To show that she's totally disabled? That she's ADLAT, okay. That she's an ADLAT permanent total? I think it's the petitioner's burden, Your Honor. Right. And the burden is, Matt, once you show that she's disabled and that because of her education and training and disabilities, she's unable to find a job. Where will we find that in the record? Well, the fact is that when she was offered a job within her accommodations from United, she went back and worked. After that, she did have testimony that she looked at places for jobs, but was unsuccessful in finding any. Well, doesn't she have to qualify under the ADLAT theory, provide evidence of a diligent and unsuccessful job search? That's not part of the standard, Judge. That's a suggestion in some of the records. But if you look at the cases, there's a case on point. It's cited in my reply brief that specifically says that she doesn't have to prove anything about her vocational rehabilitation efforts. I think I have the case here. Well, there's two. There's alternative methods of qualifying, but that's one of them. She can establish that by providing evidence of a diligent but unsuccessful attempt to find work. That's one method that can be utilized. I agree. But there's a case also that says that – I think it's the Zajac case that says that she doesn't have to prove anything with respect to her vocational rehabilitation efforts. But keep in mind, these rehabilitation efforts that she's being questioned of are only from June of 2006 to September 11th. And what happens is Sharon tells her to come to work to go to this job interview. She comes to work with a brace on her leg that Dr. Mass had prescribed, and Sharon Zajac says, what did you come here for? You can't go to a job interview with a brace on your leg. They're never going to give you a job with a brace on your leg and crutches. That's what happened. Did any of the vocational rehabilitation experts involved in this case testify that there were no jobs available for her in the market or show that opinion in a – Judge, no experts ever testified for vocational rehabilitation. All that's in the record are the reports. Okay. In those reports, did any of them express the opinion that she – there were no jobs available for her at the job interview? Mr. Belmonte's initial vocational assessment in June 2005 says that the only jobs that would be available for this woman – he thinks he might be able to find her a job within the light-duty capacity, but that would be between $7 and $10 an hour, as opposed to what she made as a union worker of $20 an hour. That's our argument. You're back to 8D1 now, though. Exactly. Exactly. But none of them ever said she's totally out of the job market. No one said she's totally disabled and unable to work any type of job. And that's not the case. Because we know she went back and worked in the accommodated position for United until they terminated her. Said we don't have any work. Well, if that's the case, that undercuts your odd lot theory, does it? Pardon me? If that's the case, doesn't that undercut your odd lot theory, that she's not employable in any known market? Well, that's reasonably available to her. Now, United, she's a union employee. She's been there for 13 years. She has certain rights. They took her back in the accommodated program with those restrictions. Then they stopped her, okay? Now the question is, is there a job somewhere else where they'll take her? And there isn't. But how do we know that? That, I guess, is your burden, and you're saying it's not there, or is it there? Judge, no one could ever give you an answer. How do you know that someone is totally disabled and unable to work in any type of job? Quadriplegics work today. Well, maybe we should get rid of odd lot entirely as a theory of recovery. I'm sorry? Maybe we should get rid of odd lot entirely, then, as a theory of recovery. Well, I think there's a lot of people in the insurance industry and others that would want to do that. I think it would be a... I bet in Wisconsin they'll work on it. I agree. But, unfortunately, we're charged to follow the law in Illinois, and the law in Illinois is clear. Well, we know people recover in Illinois under odd lot theories because we know claimants meet their burden of proof. And so we're asking you here, did you meet your burden of proof? You want that theory? Where is it? Well, first of all, there's no question that she is partially incapacitated from work. Counsel, your time is up. You'll have time on rebuttal. Counsel, please. Thank you. May it please the Court, Counsel, Mark Matranga for the defendant, respondent, United Airlines. I apologize my voice is not up to snuff. I will do my best. Well, just to help you out on that incident or that issue with your voice, I think that you've been going around and around on the odd lot theory here so far. Tell us succinctly why the claimant does not qualify under an odd lot theory. I believe that, Your Honor, because as the commission found, she failed to meet her burden, that there is no stable labor market available for her. And more specifically, no doctor has commented that her ability to work is so limited that she will be unable to find work or that there's no stable labor market or that the degree of her restrictions are so great that she will be unable to do so, that there's no stable labor market for her. There was no vocational testimonial reports indicating that there's no stable labor market for her. There was Mr. Belmonte who did say, yes, that her prognosis for work was guarded, but that she could, quote, should certainly be able to perform work between the sedentary and light duty range of physical demand, and also noted that this could, quote, or I'm sorry, quote, could include occupations such as telemarketing, telephone answering services, select security occupations, work as a receptionist, select cashier occupations, and similar types of duties. So then we could go into 8D1 as a theory of recovery, right? Potentially, but if you would just bear with me for one moment, Your Honor, on that, I will just say in advance of my comments on that, I don't think 8D1 is a mere fallback type theory, but I will explain that more. But in terms of the odd lot, there is this whole question of the petitioner's lack of cooperation with the effort, and indeed, the petitioner herself, she admitted that she terminated the VOC effort. She only made a couple of appointments. She canceled more than she made. She never did the vocational testing. There was a job fair she didn't go to. And eventually, this effort was suspended, terminated by her, not by United Airlines. Now, yes, she had been working in an accommodated position previously. She was on and off because she had several surgeries, but there was a question of whether she could permanently work in these positions. Some accommodated positions are not intended to be permanent. There's no evidence on that that it would have been permanent, so it's really a non-issue. So the evidence is lacking, unfortunately. Counsel has argued this ably before this panel and before the commission and the courts, but this is the same argument that was made to the commission. Now, the petitioner basically declared herself totally disabled because of her Social Security decision and because of the level of her disability. It's up to the claimant to prove by the law. In this case, the evidence doesn't establish that. It doesn't. And just one little additional point on that. At the time, she was actually getting some more treatment. At the time, she resigned from vocational rehabilitation. Dr. Mess, her physician, did not limit her from participating in the vocational rehabilitation effort at that time. This was August 06. So that even though she had a degree of disability, no doubt about it, and she could not go back to her prior position, no doubt about it, she was able to participate in the voc effort. Her physicians didn't prohibit her. So the idea that you can pull out of the voc effort, do minimal effort on your own, and then be declared an odd lot, that's woefully lacking in terms of the quantum of proof necessary. And, lest we forget, the standard of review on that issue definitely is the manifest way to the evidence. Yes, there are some cases. Counsel cites them. Ameritech, City of Chicago, where claimants were awarded odd lots. But the facts of those cases are not the same. I see very little argument in their brief in an attempt to distinguish why it is that the petitioner didn't get it here and they did there. But now, attacking the AP1 question, there is this suggestion that petitioner would be making $20 an hour. That is incorrect. Incorrect. Incorrect. She could not be making $20 an hour working for United Airlines. There's no evidence of that. There's her statement that she was making $20 an hour, and that's what counsel cites in the brief. She indicated her wages were roughly $20 an hour. There's no evidence that she could now make $20 an hour. The only evidence of what she could make is what the evidence showed from Mr. Belmonte's search about what cabin cleaners are making today. And they're not making $10 an hour. Her range was 7 to 10, according to Mr. Belmonte, in alternate employment. So that there is no proof of what she could be making now. As a cabin cleaner, she'd be making a lot less. Unfortunately, it's the way of the world. The jobs of cabin cleaners have been outsourced everywhere. In fact, Mr. Belmonte cited Southwest Airlines, cited Delta, I believe. They're making $8.75, $9.25, and the, I believe, the average in the Chicago metropolitan area. Because they're not represented, right? Pardon? Because they're not represented. Probably not. Probably not. I'm speculating, but probably not. But unfortunately, again, these are the facts. The facts are that Frontier, excuse me, $9.25, Southwest $8.75. The median is $8.88 in the Chicago land area. It's a little bit less statewide. So that's the evidence on what Petitioner could be making now. And 8D1 does talk about your customary employment. You know, it is not always that in your customary employment you will make more money. The blacksmith went out of business. Does the blacksmith get a wage loss based on his top earnings as a blacksmith when there's no more blacksmithy to be done? I think not. It's unfortunate, but I think it's a truism. Now, as I said earlier, I also think it's a little bit difficult to accept that it's a fallback position. Petitioner claims to be totally disabled, but now says if I don't get that, then I just, more or less as a matter of law, I get my 8D1 because I can't go back to my old job. And agreed, you can't. She can't. But the evidence on what she could be making is so unclear and so speculative that at best you might get a tiny wage loss. I don't know what that would be. And that's what the commission found, that what her earnings would be, I think they use the term unsupported. Any current wage she would be making is unsupported. That's what the commission found, and I think that's what we are left with. Now, counsel made a point about whether or not it is necessary to conduct a job search. That's Gallianetti, just to help him out on that. I think that's what the court mentioned in Gallianetti, but Gallianetti is a lot different than what we have here. Gallianetti came before this court with a job. I sat in the back when that was argued here, and the counsel for Gallianetti said, why should I have to go look for work? I looked for work. I found a job. Here's my job. Therefore, here is my wage loss. It's sort of a cogito ergo sum sort of argument. And that would be defined as what? Well, my wage loss in Gallianetti was what I'm making now in my new job versus what I could be making in my old job. Here, we can't stand before Your Honors and tell you what that would be. Indeed, indeed, it might be less. But because she doesn't have a job and because she did, in fact, resign from the Volk effort, that does affect our ability to know what she would be making. Therefore, we come to that unsupported part of the decision. Under AD-1, okay, because now we've outsourced cabin cleaning and apparently prevailing wage is $9, $10. Before, under union contract as a teamster, she was making $20. And if proper wage loss was shown, what is it you take the current wage against? What she could be making at United as a cabin cleaner or elsewhere. So you can't look at what she was making at the time she was injured? No, because that's not the measure of wage loss under Section AD-1. It's what she could be earning in her customary employment. We have seen over the last few years, Your Honor, what has happened to many of us. Perhaps not anybody in this room. I hope not. But the fact is a lot of people are making less at the same jobs they used to do. Whosever cleaning cabins for the various airlines, unless they have not been outsourced, they are all making less money. It's unfortunate but true. But the measure of wage loss is what she could be making in customary employment versus what she could be making now. And there's a problem with the second part of the equation as well. Excuse me. This woman worked as a teamster in other jobs for United, too. Isn't that correct? That is apparently correct, Your Honor. And are there still teamsters working for United Airlines in other jobs? There very well may be. I can't answer that specifically. In other words, why would you only look at the cabin service job? Because AD-1 speaks to customary employment. And has she customarily in her past worked in other jobs besides cabin service  Well, two things, Your Honor. One, her customary employment at the time she was injured was cabin cleaner. Is that what the Act says, her customary employment at the time she was injured? Customary employment, yes. I don't know how to put it any more simply. It doesn't say that on the date of entry, does it? Well, the second part of the equation, in terms of the definition of what it takes to qualify for wage loss, I'm drawing a bit of a blank, so I'm not going to try to speculate. You'd have to argue what customary means. As far as we're concerned, we don't know the other jobs she worked. The counsel mentions other jobs, but we don't know what they were. Her customary work is not teamster, and I realize that this is a big issue today. There's lots of things going on north of the border, but her customary employment wasn't teamster. She wasn't a driver. Just to clarify for the record, to qualify for the wage differential, the claimant must show either partial incapacity or must show partial incapacity that prevents the claimant from pursuing her usual customary line of employment and an impairment of earnings. So it's both. And it is involving her usual and customary line of employment. And that was as cabin cleaner. And, again, not to beat the horse, but that job no longer pays more. Now, speculatively, Your Honor, if I could sort of follow up on the drift of your question, if there were other jobs at United identified that she could work at and what those earnings were, that might be different. We might have the variables to plug into the equation. We don't have those. Petitioner did testify that other cabin cleaners had been placed elsewhere at United, and they were making more money, of course. But we don't know what those jobs were, and certainly we do not know if she could have performed them with her restrictions. So the record is just bereft of any ---- So to break the wage differential, wouldn't we, in essence, you're saying, be off in the realm of sort of speculation and conjecture? Oh, without a doubt, Your Honor, because, again, both sides of the equation are difficult. And although, generally speaking, I would have to stand by the pronouncement of this court in Gallianetti, it's not necessary to perform a job search in order to be awarded a D-1. But in the context of this case, in terms of trying to determine what could this individual be earning, other than Mr. Belmonte's general statement, 7 to 10, we don't know, because she didn't go out and look and get a job. Gallianetti had a job. And as I stand here as an attorney, as an advocate, and someone who likes to look at the workers' compact and analyze it, you know, tooth and nail, so to speak, a hypothetical wage loss, to me, is anathema. This person does not have a job. She didn't go out and get a job like Gallianetti did. I don't think this issue has ever been argued before this court. I've heard the court in past years comment on, when people have stood before you all, well, we'll just stipulate that the Petitioner could get, could earn the minimum wage, versus what she used to be able to earn. We'll stipulate to that. And I don't know that that argument has gained any traction. Again, it's too speculative in this case. The facts just don't, they're just not there on either. So you're arguing failure of proof, really, on wage differential? The evidence is not there. Because, again, we know that she could make 7 to 10, but the 10 looks like more than the average of what cabin cleaners are making. So on a certain level, one could argue there's no wage loss, period. But I'm not, I mean, that's certainly part of the argument. But the main argument is that we don't know what she would be earning as the cabin cleaner, other than we have this statistic that's an average. We know what Frontier pays. We know what is paid to those at Southwest. So in any event, that's our argument on the AP1. I thank you. It's always a good idea to get your voice back, Counsel. You know, I have good days and bad days. I had some surgery three weeks ago, so today's a good day, I hope. The counsel says there is no evidence in the record. But yet, he hired Joseph Del Monte, a certified vocational rehabilitation expert, whose job it is to evaluate all the jobs in the marketplace that are out there for a person with these disabilities, and who came in and said that, by the way, she was making $17.75 as a cabin worker when she got hurt, and, by the way, the only jobs available in the entire market in the Chicagoland area are between $7 and $10. That's his expert, not mine. I didn't call a vocational expert. But to get up here and tell you that there is speculative testimony as to what the range of earnings of a worker with her disability is, I guess he's saying his expert doesn't have any ability or any expertise, because that is the evidence. Now, the other thing, you asked about odd lot permanent total, and I cited you in my brief. I didn't go over it again, but look at the city of Chicago case. It clearly says, if an employee, two standards with respect to this diligent, it says, you can establish an odd lot in two ways. If the employee can present evidence of a diligent attempt to find work that ultimately ended unsuccessfully or, two, an injured employee can demonstrate because of her skills, training, education, and age, she will not regularly be employed in the well-known branch of the labor market. So it's worth either one or the other. And also, if you look at the other case, you'll see it cited here. American Services says the same thing. In that case, she had a low back surgery, one. She had a low back surgery, couldn't go back to find light-duty work. They found her disabled. But in both of those cases, by the way, she was also found totally disabled by Social Security. Now, counsel said, oh, that means nothing if you're totally disabled by Social Security. I don't know why they find people totally disabled except for the fact that their standards say that they can't find work readily available within a 60-mile radius of the area where they work with their disability. And then this sham, and it is a sham, that just because United outsourced cabin service working, that means that there is no work available for this woman. There's no specific training to be a cabin service worker. They put you in that place loading the planes instead of putting you on a line making the food. It's no different. This isn't a union carpenter or iron worker. This is a laborer. It's what she is. She's a laborer. She can do any type of laboring job before this injury. She can't do them afterwards. It's a fact they can't deny. So they bring in this argument that since United outserviced this work in cabin service work, then she couldn't make any more than what they're making today, by the way, at Frontier or someplace else, not at United. Their argument is disingenuous. There is no medical evidence that this woman is not partially incapacitated from work. There is no evidence whatsoever that she didn't suffer a significant earnings loss, which is a huge one. They showed she completely cooperated with everybody. Well, Judge, when cooperation requires a good faith effort on both parts, I'm suggesting to you that when United's vocational rehabilitation expert, Sharon Sajak, says, don't show up to work interviews with a cast on your boot and with crutches, that is not being cooperative either. Thank you, Counselor. Your time is up. Court will take the matter under advisory.